

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

### CASE NO.  **12 CR   6 1 CVE**

UNITED STATES OF AMERICA

v.

BIZJET INTERNATIONAL
SALES AND SUPPORT, INC.,

Defendant.

_____/

**FILED**

MAR 1 4 2012

., Phil Lombardi, Clerk
**U.S. DISTRICT COURT**

## DEFERRED PROSECUTION AGREEMENT

Defendant BizJet International Sales and Support, Inc. ("BizJet"), by its undersigned

representatives, pursuant to authority granted by BizJet's Board of Directors, and the United

States Department of Justice, Criminal Division, Fraud Section (the "Department"), enter into

this deferred prosecution agreement (the "Agreement"). The terms and conditions of this

Agreement are as follows:

### Criminal Information and Acceptance of Responsibility

1.       BizJet acknowledges and agrees that the Department will file the attached one-

count criminal Information in the United States District Court for the Northern District of

Oklahoma charging BizJet with conspiracy to violate the laws of the United States, in violation

of 18 U.S.C. § 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices

Act ("FCPA"), 15 U.S.C. § 78dd-2. In so doing, BizJet: (a) knowingly waives its right to

indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment

to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule

of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect to venue and

consents to the filing of the Information, as provided under the terms of this Agreement, in the

United States District Court for the Northern District of Oklahoma.

2.      BizJet admits, accepts, and acknowledges that it is responsible for the acts of its

officers, directors, employees, and agents as charged in the Information, and as set forth in the

Statement of Facts attached hereto as Attachment A and incorporated by reference into this

Agreement, and that the allegations described in the Information and the facts described in

Attachment A are true and accurate.  Should the Department pursue the prosecution that is

deferred by this Agreement, BizJet agrees that it will neither contest the admissibility of nor

contradict the Statement of Facts in any such proceeding, including any guilty plea or sentencing

proceeding.

## Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the

Information is filed and ending three (3) years and seven (7) calendar days from that date (the

"Term").  However, BizJet agrees that, in the event that the Department determines, in its sole

discretion, that BizJet has knowingly violated any provision of this Agreement, an extension or

extensions of the term of the Agreement may be imposed by the Department, in its sole

discretion, for up to a total additional time period of one year, without prejudice to the

Department's right to proceed as provided in Paragraphs 13-16 below.  Any extension of the

Agreement extends all terms of this Agreement, including the terms of the reporting requirement

under Paragraph 10, for an equivalent period.  Conversely, in the event the Department finds, in

its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for

the reporting requirement in Paragraph 10, and that the other provisions of this Agreement have

been satisfied, the Term of the Agreement may be terminated early.

### Relevant Considerations

4.      The Department enters into this Agreement based on the individual facts and

circumstances presented by this case and BizJet.  Among the facts considered were the

following: (a) following discovery of the FCPA violations during the course of an internal audit

of the implementation of enhanced compliance related to third-party consultants, BizJet initiated

an internal investigation and voluntarily disclosed to the Department the misconduct described in

the Information and Statement of Facts; (b) BizJet's cooperation has been extraordinary,

including conducting an extensive internal investigation, voluntarily making U.S. and foreign

employees available for interviews, and collecting, analyzing, and organizing voluminous

evidence and information for the Department; (c) BizJet has engaged in extensive remediation,

including terminating the officers and employees responsible for the corrupt payments,

enhancing its due diligence protocol for third-party agents and consultants, and instituting

heightened review of proposals and other transactional documents for all BizJet contracts; (d)

BizJet has committed to continue to enhance its compliance program and internal controls,

including ensuring that its compliance program satisfies the minimum elements set forth in

Attachment C to this Information; and (e) BizJet has agreed to continue to cooperate with the

Department in any ongoing investigation of the conduct of BizJet and its officers, directors,

employees, agents, and consultants relating to violations of the FCPA as provided in Paragraph 5

below.

5.      BizJet shall continue to cooperate fully with the Department in any and all matters

relating to corrupt payments.  At the request of the Department, BizJet shall also cooperate fully

with other domestic or foreign law enforcement authorities and agencies, as well as the

Multilateral Development Banks ("MDBs"), in any investigation of BizJet, its parent company or

its affiliates, or any of its present and former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to corrupt payments. BizJet agrees that its cooperation shall include, but is not limited to, the following:

a.      BizJet shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, those of its parent company and affiliates, and those of its present and former directors, officers, employees, agents, and consultants concerning all matters relating to corrupt payments about which BizJet has any knowledge or about which the Department may inquire. This obligation of truthful disclosure includes the obligation of BizJet to provide to the Department, upon request, any document, record or other tangible evidence relating to such corrupt payments about which the Department may inquire of BizJet.

b.      Upon request of the Department, with respect to any issue relevant to its investigation of corrupt payments in connection with the operations of BizJet, or any of its present or former subsidiaries or affiliates, BizJet shall designate knowledgeable employees, agents or attorneys to provide to the Department the information and materials described in Paragraph 5(a) above on behalf of BizJet. It is further understood that BizJet must at all times provide complete, truthful, and accurate information.

c.      With respect to any issue relevant to the Department's investigation of corrupt payments in connection with the operations of BizJet, its parent company, or any of its present or former affiliates, BizJet shall use its best efforts to make available for interviews or testimony, as requested by the Department, present or former officers, directors, employees, agents and consultants of BizJet. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law enforcement

and regulatory authorities.  Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of BizJet, may have material information regarding the matters under investigation.

        d.     With respect to any information, testimony, documents, records or other tangible evidence provided to the Department pursuant to this Agreement, BizJet consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government, and the MDBs, of such materials as the Department, in its sole discretion, shall deem appropriate.

### Payment of Monetary Penalty

    6.    The Department and BizJet agree that application of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine range yields the following analysis:

        a.     The 2010 USSG are applicable to this matter.

        b.     Offense Level.  Based upon USSG § 2C1.1, the total offense level is 34, calculated as follows:

| | |
|---|---|
| (a)(2)  Base Offense Level | 12 |
| (b)(1)  Multiple Bribes | +2 |
| (b)(2)  Value of benefit received more than $7,000,000 | +20 |
| **TOTAL** | 34 |

        c.     Base Fine.  Based upon USSG § 8C2.4(a)(1), the base fine is $28,500,000 (the fine indicated in the Offense Level Fine Table)

        d.     Culpability Score.  Based upon USSG § 8C2.5, the culpability score is 3, calculated as follows:

| | |
|---|---|
| (a)     Base Culpability Score | 5 |
| (b)(3)  the organization had 200 or more employees and | |

|  | an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +3 |
|---|---|---|
| (g)(1) | The organization, prior to imminent threat of disclosure or government investigation and within a reasonably prompt time after becoming aware of the offense, reported the offense to appropriate governmental authorities, fully cooperated in the investigation, and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 5 |

**TOTAL**                                                                    3

Calculation of Fine Range:

| Base Fine | $28,500,000 |
|---|---|
| Multipliers | 0.6(min)/1.2(max) |
| Fine Range | $17,100,000 / $34,200,000 |

BizJet agrees to pay a monetary penalty in the amount of $11,800,000, an approximately thirty percent reduction off the bottom of the fine range, to the United States Treasury within ten (10) days of the filing of the Information.  BizJet and the Department agree that this fine is appropriate given the facts and circumstances of this case, including the nature and extent of BizJet's voluntary disclosure, extraordinary cooperation, and extensive remediation in this matter.  The $11,800,000 penalty is final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Department that $11,800,000 is the maximum penalty that may be imposed in any future prosecution, and the Department is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Department agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of

a future judgment.  BizJet acknowledges that no tax deduction may be sought in connection with the payment of any part of this $11,800,000 penalty.

## Conditional Release from Criminal Liability

7.      In return for the full and truthful cooperation of BizJet, and its compliance with the other terms and conditions of this Agreement, the Department agrees, subject to Paragraphs 13-16 below, not to use any information related to the conduct described in the attached Statement of Facts against BizJet in any criminal case, except:  (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation to any provision of Title 26 of the United States Code.  In addition, the Department agrees, except as provided herein, that it will not bring any criminal case against BizJet related to the conduct of present and former officers, directors, employees, agents, and consultants, as described in the attached Statement of Facts, or relating to information BizJet disclosed to the Department prior to the date on which this Agreement was signed.

a.      This Paragraph does not provide any protection against prosecution for any future corrupt payments by BizJet.

b.      In addition, this Paragraph does not provide any protection against prosecution of any present or former officer, director, employee, agent or consultant of BizJet for any violations committed by them.

## Corporate Compliance Program and Reporting Requirements

8.      BizJet represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws throughout its operations including those of its affiliates, agents,

and joint ventures, and those of its contractors and subcontractors where responsibilities include

interacting with foreign officials or other high-risk activities. Implementation of these policies

and procedures shall not be construed in any future enforcement proceeding as providing

immunity or amnesty for any crimes not disclosed to the Department as of the date of signing of

this Agreement for which BizJet would otherwise be responsible.

9.      In order to address any deficiencies in its internal controls, policies, and

procedures, BizJet represents that it has undertaken, and will continue to undertake in the future,

in a manner consistent with all of its obligations under this Agreement, a review of its existing

internal controls, policies, and procedures regarding compliance with the FCPA and other

applicable anti-corruption laws. If necessary and appropriate, BizJet will adopt new or modify

existing internal controls, policies, and procedures in order to ensure that BizJet maintains: (a) a

system of internal accounting controls designed to ensure the making and keeping of fair and

accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance code,

standards, and procedures designed to detect and deter violations of the FCPA and other

applicable anti-corruption laws. The internal controls system and compliance code, standards,

and procedures will include, but not be limited to, the minimum elements set forth in Attachment

C, which is incorporated by reference into this Agreement.

10.     BizJet agrees that it will report to the Department periodically, at no less than

twelve-month intervals during a three-year term, regarding remediation and implementation of

the compliance program and internal controls, policies, and procedures described in Attachment

C. Should BizJet discover credible evidence that questionable or corrupt payments or

questionable or corrupt transfers of property or interests may have been offered, promised, paid,

or authorized by any BizJet entity or person, or any entity or person working directly for BizJet

(including its affiliates and any agent), or that related false books and records have been maintained, BizJet shall promptly report such conduct to the Department. During this three-year period, BizJet shall: (1) conduct an initial review and submit an initial report, and (2) conduct and prepare at least two (2) follow-up reviews and reports, as described below:

     a.  By no later than one (1) year from the date this Agreement is executed, BizJet shall submit to the Department a written report setting forth a complete description of its remediation efforts to date, its proposals reasonably designed to improve BizJet's internal controls, policies, and procedures for ensuring compliance with the FCPA and other applicable anti-corruption laws, and the proposed scope of the subsequent reviews. The report shall be transmitted to Deputy Chief - FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, NW, Bond Building, Fourth Floor, Washington, DC 20530. BizJet may extend the time period for issuance of the report with prior written approval of the Department.

     b.  BizJet shall undertake at least two (2) follow-up reviews, incorporating the Department's views on BizJet's prior reviews and reports, to further monitor and assess whether BizJet's policies and procedures are reasonably designed to detect and prevent violations of the FCPA and other applicable anti-corruption laws.

     c.  The first follow-up review and report shall be completed by no later than one (1) year after the initial review. The second follow-up review and report shall be completed by no later than one (1) year after the completion of the preceding follow-up review.

     d.  BizJet may extend the time period for submission of any of the follow-up reports with prior written approval of the Department.

## Deferred Prosecution

11.     In consideration of: (a) the past and future cooperation of BizJet described in

Paragraphs 4 and 5 above; (b) BizJet's payment of a criminal monetary penalty of $11,800,000;

and (c) BizJet's implementation and maintenance of remedial measures as described in

Paragraphs 8 and 9 above, the Department agrees that any prosecution of BizJet for the conduct

set forth in the attached Statement of Facts, and for the conduct that BizJet disclosed to the

Department prior to the signing of this Agreement, be and hereby is deferred for the Term of this

Agreement.

12.     The Department further agrees that if BizJet fully complies with all of its

obligations under this Agreement, the Department will not continue the criminal prosecution

against BizJet described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall

expire.  Within thirty (30) days of the Agreement's expiration, the Department shall seek

dismissal with prejudice of the criminal Information filed against BizJet described in Paragraph

1.

## Breach of the Agreement

13.     If, during the Term of this Agreement, the Department determines, in its sole

discretion, that BizJet has (a) committed any U.S. crime subsequent to the signing of this

Agreement, (b) at any time provided deliberately false, incomplete, or misleading information, or

(c) otherwise breached the Agreement, BizJet shall thereafter be subject to prosecution for any

federal criminal violation of which the Department has knowledge, including the charges in the

Information attached as Exhibit 1, which may be pursued by the Department in the U.S. District

Court for the Northern District of Oklahoma.  Any such prosecution may be premised on

information provided by BizJet.  Any such prosecution that is not time-barred by the applicable

statute of limitations on the date of the signing of this Agreement may be commenced against BizJet notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, BizJet agrees that the statute of limitations with respect to any prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.

14.     In the event that the Department determines that BizJet has breached this Agreement, the Department agrees to provide BizJet with written notice of such breach prior to instituting any prosecution resulting from such breach. BizJet shall, within thirty (30) days of receipt of such notice, have the opportunity to respond to the Department in writing to explain the nature and circumstances of such breach, as well as the actions BizJet has taken to address and remediate the situation, which explanation the Department shall consider in determining whether to institute a prosecution.

15.     In the event that the Department determines that BizJet has breached this Agreement: (a) all statements made by or on behalf of BizJet to the Department or to the Court, including the attached Statement of Facts, and any testimony given by BizJet before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Department against BizJet; and (b) BizJet shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that statements made by or on behalf of BizJet prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed. The decision whether conduct or statements of any current director or employee, or any person acting on behalf of, or at the direction of, BizJet

will be imputed to BizJet for the purpose of determining whether BizJet has violated any provision of this Agreement shall be in the sole discretion of the Department.

16.     BizJet acknowledges that the Department has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if BizJet breaches this Agreement and this matter proceeds to judgment. BizJet further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

### Sale or Merger of BizJet

17.     BizJet agrees that in the event it sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, or transfer, it shall include in any contract for sale, merger, or transfer a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.

### Public Statements by BizJet

18.     BizJet expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for BizJet make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by BizJet set forth above or the facts described in the attached Statement of Facts. Any such contradictory statement shall, subject to cure rights of BizJet described below, constitute a breach of this Agreement and BizJet thereafter shall be subject to prosecution as set forth in Paragraphs 13-16 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to BizJet for the purpose of determining whether they have breached this Agreement shall be at the sole discretion

of the Department.  If the Department determines that a public statement by any such person

contradicts in whole or in part a statement contained in the Statement of Facts, the Department

shall so notify BizJet, and BizJet may avoid a breach of this Agreement by publicly repudiating

such statement(s) within five (5) business days after notification.  Consistent with the obligations

of BizJet as set forth above, BizJet shall be permitted to raise defenses and to assert affirmative

claims in civil and regulatory proceedings relating to the matters set forth in the Statement of

Facts.  This Paragraph does not apply to any statement made by any present or former officer,

director, employee, or agent of BizJet in the course of any criminal, regulatory, or civil case

initiated against such individual, unless such individual is speaking on behalf of BizJet.

19.      BizJet agrees that if it, its parent company, or any of its direct or indirect

affiliates issues a press release or holds any press conference in connection with this Agreement,

BizJet shall first consult the Department to determine (a) whether the text of the release or

proposed statements at the press conference are true and accurate with respect to matters between

the Department and BizJet; and (b) whether the Department has no objection to the release.

20.      The Department agrees, if requested to do so, to bring to the attention of

governmental and other debarment authorities the facts and circumstances relating to the nature

of the conduct underlying this Agreement, including the nature and quality of BizJet's

cooperation and remediation.  By agreeing to provide this information to debarment authorities,

the Department is not agreeing to advocate on behalf of BizJet, but rather is agreeing to provide

facts to be evaluated independently by the debarment authorities.

### Limitations on Binding Effect of Agreement

21.      This Agreement is binding on BizJet and the Department but specifically does

not bind any other federal agencies, or any state, local or foreign law enforcement or regulatory

agencies, or any other authorities, although the Department will bring the cooperation of BizJet and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by BizJet.

## Notice

22.     Any notice to the Department under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to the Deputy Chief – FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, Fourth Floor, 1400 New York Avenue, N.W., Washington, D.C. 20005. Any notice to BizJet under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Sven Duve, Chief Financial Officer, BizJet International Sales and Support, Inc., 3515 North Sheridan Road, Tulsa, Oklahoma 74115; and Jay Holtmeier, Wilmer Cutler Pickering Hale and Dorr LLP, 399 Park Avenue, New York, New York 10022. Notice shall be effective upon actual receipt by the Department or BizJet.

## Complete Agreement

23.     This Agreement sets forth all the terms of the agreement between BizJet and the Department. No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Department, the attorneys for BizJet and a duly authorized representative of BizJet.

**AGREED:**

**FOR BIZJET INTERNATIONAL**
**SALES AND SUPPORT, INC.:**

Date: December 20, 2011                By: _____
                                            SVEN DUVE
                                            Chief Financial Officer
                                            BizJet International Sales and Support, Inc.


Date: 12/20/11                         By: _____
                                            JAY HOLTMEIER
                                            Wilmer Cutler Pickering Hale and
                                            Dorr LLP


**FOR THE DEPARTMENT OF JUSTICE:**

                                            DENIS J. McINERNEY
                                            Chief, Fraud Section
                                            Criminal Division
                                            United States Department of Justice

Date: 12/21/11                         BY: _____
                                            DANIEL S. KAHN
                                            Trial Attorney


Date: 12/21/11                         BY: _____ /DSK
                                            STEPHEN J. SPIEGELHALTER
                                            Trial Attorney

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for BizJet International Sales and Support, Inc. ("BizJet"). I understand the terms of this Agreement and voluntarily agree, on behalf of BizJet, to each of its terms. Before signing this Agreement, I consulted outside counsel for BizJet. Counsel fully advised me of the rights of BizJet, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of BizJet. I have advised and caused outside counsel for BizJet to advise the Board of Directors fully of the rights of BizJet, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of BizJet, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Chief Financial Officer for BizJet and that I have been duly authorized by BizJet to execute this Agreement on behalf of BizJet.

Date: _December 20_ , 2011

> BIZJET INTERNATIONAL
> SALES AND SUPPORT, INC.

By: _____

SVEN DUVE
Chief Financial Officer
BizJet International Sales and Support, Inc.

## CERTIFICATE OF COUNSEL

I am counsel for BizJet International Sales and Support, Inc. ("BizJet") in the matter covered by this Agreement. In connection with such representation, I have examined relevant BizJet documents and have discussed the terms of this Agreement with the BizJet Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of BizJet has been duly authorized to enter into this Agreement on behalf of BizJet and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of BizJet and is a valid and binding obligation of BizJet. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the Chief Financial Officer of BizJet. I have fully advised them of the rights of BizJet, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of BizJet to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: _DECEMBER 20_, 2011

By: _____
JAY HOLTMEIER
Wilmer Cutler Pickering Hale and Dorr LLP
Counsel for BizJet International Sales and Support, Inc.

2

ATTACHMENT A

## STATEMENT OF FACTS

1.      The following Statement of Facts is incorporated by reference as part of the

Deferred Prosecution Agreement (the "Agreement") between the United States Department of

Justice, Criminal Division, Fraud Section (the "Department") and BizJet International Sales and

Support, Inc. ("**BIZJET**"), and the parties hereby agree and stipulate that the following

information is true and accurate.  **BIZJET** admits, accepts, and acknowledges that it is

responsible for the acts of its officers, directors, employees, and agents as set forth below.

Should the Department pursue the prosecution that is deferred by this Agreement, **BIZJET**

agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in

any such proceeding.  If this matter were to proceed to trial, the Department would prove beyond

a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the criminal

Information attached to this Agreement.  This evidence would establish the following:

### *Relevant BizJet-Related Corporate Entities and Employees*

2.      **BIZJET** was headquartered in Tulsa, Oklahoma, incorporated in Oklahoma, and

thus a "domestic concern," as that term is used in the FCPA, Title 15, United States Code,

Section 78dd-2(h)(1)(B).  **BIZJET** was in the business of providing aircraft maintenance, repair

and overhaul ("MRO") services to customers in the United States and abroad.  Part of **BIZJET**'s

business was to service aircraft owned and operated by a number of governmental and other

customers in Latin America, including in Mexico and Panama.

3.      Executive A was a senior executive at **BIZJET** from in or around 2004 to in or

around 2010.  Executive A was responsible for the operations and finances of **BIZJET**.

A-1

4.      Executive B was a senior executive at **BIZJET** from in or around May 2005 through in or around March 2010.  Executive B's responsibilities at **BIZJET** included oversight of **BIZJET**'s efforts to obtain business from new customers and to maintain and increase business with existing customers.

5.      Executive C was a senior finance executive at **BIZJET** from in or around 2004 to in or around 2010.  Executive C was responsible for overseeing **BIZJET**'s accounts and finances and the approval of payment of invoices and of wire and check requests.

6.      Sales Manager A was a regional sales manager at **BIZJET** from in or around 2004 to in or around 2010.  Sales Manager A interacted with potential and existing customers and was responsible for obtaining business from new customers and maintaining and increasing business with existing customers.

7.      Shell Company A was owned by Sales Manager A and run out of Sales Manager A's personal residence in Van Nuys, California.  Shell Company A operated under the pretense of providing MRO services.  Sales Manager A was the only officer, director and employee of Shell Company A.

### *Relevant Customers and Foreign Officials*

8.      The Mexican Policia Federal Preventiva (the "Mexican Federal Police") was the government police force in Mexico and an "agency" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).  The Mexican Federal Police was a customer of **BIZJET**.

9.      The Mexican Coordinacion General de Transportes Aereos Presidenciales (the "Mexican President's Fleet") was the air fleet for the President of Mexico and an "agency" of a

A-2

foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2). The Mexican President's Fleet was a customer of **BIZJET**.

10.     The air fleet for the Gobierno del Estado de Sinaloa ("Sinaloa") was the air fleet for the Governor of the Mexican State of Sinaloa and an "agency" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2). Sinaloa was a customer of **BIZJET**.

11.     The Republica de Panama Autoridad Aeronautica Civil (the "Panama Aviation Authority") was the aviation authority of Panama and an "agency" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2). The Panama Aviation Authority was a customer of **BIZJET**.

12.     Official 1 was a Captain in the Mexican Federal Police and had broad decision-making authority and influence over the award of contracts to MRO service providers. Official 1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

13.     Official 2 was a Colonel in the Mexican President's Fleet and had broad decision-making authority and influence over the award of contracts to MRO service providers. Official 2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

14.     Official 3 was a Captain in the Mexican President's Fleet and had broad decision-making authority and influence over the award of contracts to MRO service providers. Official 3 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

A-3

15.     Official 4 was employed by the Mexican President's Fleet and had broad decision-making authority and influence over the award of contracts to MRO service providers. Official 4 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

16.     Official 5 was a Director of Air Services at Sinaloa and had broad decision-making authority and influence over the award of contracts to MRO service providers. Official 5 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

17.     Official 6 was a chief mechanic at the Panama Aviation Authority and had broad decision-making authority and influence over the award of contracts to MRO service providers. Official 6 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

### *The Bribery Scheme and the Violations*

18.     From in or around 2004, and continuing through in or around March 2010, **BIZJET** and its officers, directors, and employees, including Executive A, Executive B, Executive C, and Sales Manager A, together with Shell Company A and others, conspired to make unlawful payments to foreign officials to use their influence with foreign government agencies and instrumentalities, including the Mexican Federal Police, the Mexican President's Fleet, Sinaloa, the Panama Aviation Authority, and other customers, in order to assist **BIZJET** in obtaining and retaining business for and with, and directing business to, **BIZJET**.

19.     **BIZJET**, through its employees, including Executive A, Executive B, Executive C, and Sales Manager A, would and did discuss in person, via telephone and via electronic mail

A-4

("e-mail") making bribe payments — which they called "commissions," "incentives" or "referral fees" — to employees of customers, including foreign government customers, in order to obtain and retain for **BIZJET** contracts to perform MRO services.

20.     Executive A, Executive B, Executive C, and Sales Manager A, together with others, would and did offer to pay, promise to pay and authorize the payment of bribes, directly and indirectly, to and for the benefit of employees of foreign government customers in exchange for those foreign officials' agreements to help **BIZJET** secure contracts with the foreign government customers by which they were employed.

21.     Executive A, Executive B, Executive C, and Sales Manager A, together with others, would and did discuss in person, via telephone and via e-mail the manner and means by which the bribe payments were to be paid by **BIZJET** — for example, whether the payments were to be made by check, wire or cash, and the names and locations of the bank accounts to which the bribe payments should be transferred.

22.     Executive A, Executive B, Executive C, and Sales Manager A, together with others, would and did attempt to conceal the payments to foreign officials by using Shell Company A to funnel the payments from **BIZJET** to the foreign officials and by making payments in cash delivered by hand to the foreign officials.

23.     **BIZJET**, through its employees, including Executive A, Executive B, Executive C, and Sales Manager A, would and did wire and cause to be wired certain bribe payments from **BIZJET**'s bank account in New York to bank accounts in Oklahoma, California and elsewhere.

24.     On or about November 16, 2005, at a Board of Directors meeting of the **BIZJET** board, Executive A and Executive B discussed with the Board that the decision of where an

aircraft is sent for maintenance work is generally made by the potential customer's director of maintenance or chief pilot, that these individuals are demanding $30,000 to $40,000 in commissions, and that **BIZJET** would pay referral fees in order to gain market share.

25.     On or about June 6, 2006, Sales Manager A discussed with a customer-relations employee at **BIZJET** located in Tulsa, Oklahoma, that **BIZJET** would purchase a cellular telephone for Official 6 and pay $10,000 to Official 6 for his instrumental assistance in securing for **BIZJET** a contract with the Panama Aviation Authority.

26.     On or about June 7, 2006, Executive B sent an e-mail from Tulsa, Oklahoma, to the customer-relations employee at **BIZJET**, copying Executive C and Sales Manager A, in which Executive B approved the cellular telephone and $10,000 bribe to Official 6.

27.     On or about September 28, 2006, Sales Manager A sent an e-mail to Executive B in Tulsa, Oklahoma, stating that Official 2 "just call [sic] me and ask [sic] for his commision, [sic] I need to travel to mexico [sic] this tuesday [sic].  Tomorrow, please help me make this payment..."

28.     On or about November 9, 2006, Sales Manager A sent an e-mail to Executive B stating that **BIZJET** needed to pay $2,000 to Official 3.

29.     On or about October 30, 2007, Executive B, Executive C, and Sales Manager A discussed via e-mail wire transferring $30,000 to Sales Manager A's business account to be passed on to Official 2.

30.     On or about October 31, 2007, **BIZJET**, through Executive C, caused $30,000 to be wired from **BIZJET**'s bank account in New York to Shell Company A's bank account in

California for the purpose of making a payment to Official 2 in return for Official 2's help in securing a contract for **BIZJET** with the Mexican President's Fleet.

31.     On or about October 31, 2007, Executive C sent an e-mail from Tulsa, Oklahoma, to Sales Manager A, copying others, and stated, "Please note that the $30k wire has been sent. Please confirm that you receive it.  Thx."

32.     On or about October 31, 2007, Sales Manager A responded with the subject of the e-mail, "re: from Los Angeles Airport Mex pres comm," and stated that he was on his way to Mexico with the cash meant for Official 2 "on board."

33.     On or about February 21, 2008, Executive B sent an e-mail to Executive C stating that Sales Manager A "has recently purchased some high dollar stuff for [the Mexican Federal Police] and chile [sic].  His card is maxed.  Can we put an additional 10k for a period. [sic]  He is departing today and needs it."

34.     On or about February 21, 2008, Executive B notified Sales Manager A that the increase was made.

35.     On or about November 21, 2008, **BIZJET**, through Executive C, caused $18,000 to be wired from **BIZJET**'s bank account in New York to Shell Company A's bank account in California for the purpose of making a payment to Official 5 in return for Official 5's help in securing a contract for **BIZJET** with Sinaloa.

36.     On or about November 22, 2008, Sales Manager A issued a check from Shell Company A's account to Official 5 in the amount of $18,000 in return for Official 5's help in securing a contract for **BIZJET** with Sinaloa.

A-7

37.    On or about December 1, 2008, Sales Manager A issued a check from Shell Company A's bank account in California in the amount of $50,000 to Official 4 in return for Official 4's help in securing a contract for **BIZJET** with the Mexican President's Fleet.

38.    On or about April 6, 2009, Sales Manager A caused an invoice to be submitted on behalf of Shell Company A to **BIZJET**, to the attention of Executive C in Tulsa, Oklahoma, in the amount of $176,000 for payments to be made to officials employed at the Mexican Federal Police in return for the officials' help in securing a contract for **BIZJET** with the Mexican Federal Police.

39.    On or about April 7, 2009, Sales Manager A issued a check from Shell Company A's bank account in California in the amount of $40,000 to Official 4 in return for Official 4's help in securing a contract for **BIZJET** with the Mexican President's Fleet.

40.    On or about April 13, 2009, **BIZJET**, through Executive C, caused $176,000 to be wire transferred from **BIZJET**'s bank account in New York to the bank account of Shell Company A in California for the purpose of making payments to officials employed at the Mexican Federal Police in return for the officials' help in securing a contract for **BIZJET** with the Mexican Federal Police.

41.    On or about October 6, 2009, Sales Manager A caused an invoice to be submitted on behalf of Shell Company A to **BIZJET**, to the attention of Executive C in Tulsa, Oklahoma, in the amount of $210,000 for payments to be made to officials employed at the Mexican Federal Police in return for the officials' help in securing a contract for **BIZJET** with the Mexican Federal Police.

A-8

42.    On or about October 15, 2009, **BIZJET**, through Executive C, caused $210,000 to be wire transferred from **BIZJET**'s bank account in New York to the bank account of Shell Company A in California for the purpose of making payments to officials employed at the Mexican Federal Police in return for the officials' help in securing a contract for **BIZJET** with the Mexican Federal Police.

43.    On or about October 27, 2009, Sales Manager A submitted a check request in the amount of $6,417.44 for payment to Official 5 in return for Official 5's help in securing business for **BIZJET** with Sinaloa.

44.    On or about October 27, 2009, **BIZJET**, through Executive C, caused two checks to be sent to Official 5 in the amounts of $22,912.38 and $6,417.44 in return for Official 5's help in securing business for **BIZJET** with Sinaloa.

ATTACHMENT B

## CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, BizJet International Sales and Support, Inc. ("BizJet" or the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Department") regarding issues arising in relation to certain improper payments to foreign officials to facilitate the award of contracts and assist in obtaining business for the Company; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Department; and

WHEREAS, the Company's Chief Financial Officer, Sven Duve, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Department;

Therefore, the Board of Directors has RESOLVED that:

1.      The Company (a) acknowledges the filing of the one-count Information charging BizJet with participating in a conspiracy to violate the laws of the United States, in violation of 18 U.S.C. § 371, that is, to violate the antibribery provisions of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-2; (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Department; and (c) agrees to accept monetary criminal penalties against BizJet totaling $11,800,000, and to pay a total of $11,800,000 to the United States Treasury with respect to the conduct described in the Information;

2.     The Chief Financial Officer of BizJet, Sven Duve, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Chief Financial Officer of BizJet, Sven Duve, may approve;

3.     The Chief Financial Officer of BizJet, Sven Duve, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

4.     All of the actions of the Chief Financial Officer of BizJet, Sven Duve, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: _December 20_, 2011

By: _____
Corporate Secretary
BizJet International Sales and Support, Inc.

B-2

ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* and other applicable anti-corruption laws, BizJet International Sales and Support, Inc. ("BizJet" or the "company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, BizJet agrees to adopt new or to modify existing internal controls, policies, and procedures in order to ensure that it maintains:  (a) a system of internal accounting controls designed to ensure that BizJet makes and keeps fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance code, standards, and procedures designed to detect and deter violations of the FCPA and other applicable anti-corruption laws.  At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the company's existing internal controls, policies, and procedures:

1.      BizJet will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable foreign law counterparts (collectively, the "anti-corruption laws,"), which policy shall be memorialized in a written compliance code.

2.      BizJet will ensure that its senior management provides strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws and its compliance code.

C-1

3.    BizJet will develop and promulgate compliance standards and procedures designed to reduce the prospect of violations of the anti-corruption laws and BizJet's compliance code, and BizJet will take appropriate measures to encourage and support the observance of ethics and compliance standards and procedures against foreign bribery by personnel at all levels of the company.  These anti-corruption standards and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of BizJet in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners"), to the extent that agents and business partners may be employed under BizJet's corporate policy.  BizJet shall notify all employees that compliance with the standards and procedures is the duty of individuals at all levels of the company.  Such standards and procedures shall include policies governing:

    a.    gifts;

    b.    hospitality, entertainment, and expenses;

    c.    customer travel;

    d.    political contributions;

    e.    charitable donations and sponsorships;

    f.    facilitation payments; and

    g.    solicitation and extortion.

4.    BizJet will develop these compliance standards and procedures, including internal controls, ethics, and compliance programs on the basis of a risk assessment addressing the individual circumstances of the company, in particular the foreign bribery risks facing the

C-2

company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses and permits in the company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

5.      BizJet shall review its anti-corruption compliance standards and procedures, including internal controls, ethics, and compliance programs, no less than annually, and update them as appropriate, taking into account relevant developments in the field and evolving international and industry standards, and update and adapt them as necessary to ensure their continued effectiveness.

6.      BizJet will assign responsibility to one or more senior corporate executives of BizJet for the implementation and oversight of BizJet's anti-corruption policies, standards, and procedures.  Such corporate official(s) shall have direct reporting obligations to independent monitoring bodies, including internal audit, BizJet's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

7.      BizJet will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts to ensure that they cannot be used for the purpose of foreign bribery or concealing such bribery.

8.      BizJet will implement mechanisms designed to ensure that its anti-corruption policies, standards, and procedures are effectively communicated to all directors, officers,

C-3

employees, and, where appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors, officers, and employees, and, where necessary and appropriate, agents and business partners; and (b) annual certifications by all such directors, officers, and employees, and, where necessary and appropriate, agents, and business partners, certifying compliance with the training requirements.

9.     BizJet will maintain, or where necessary establish, an effective system for:

a.     Providing guidance and advice to directors, officers, employees, and, where appropriate, agents and business partners, on complying with BizJet's anti-corruption compliance policies, standards, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the company operates;

b.     Internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners, not willing to violate professional standards or ethics under instructions or pressure from hierarchical superiors, as well as for directors, officers, employees, and, where appropriate, agents and business partners, willing to report breaches of the law or professional standards or ethics concerning anti-corruption occurring within the company, suspected criminal conduct, and/or violations of the compliance policies, standards, and procedures regarding the anti-corruption laws for directors, officers, employees, and, where necessary and appropriate, agents and business partners; and

c.     Responding to such requests and undertaking appropriate action in response to such reports.

C-4

10.     BizJet will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and BizJet's anti-corruption compliance code, policies, and procedures by BizJet's directors, officers, and employees. BizJet shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, ethics, and compliance program and making modifications necessary to ensure the program is effective.

11.     To the extent that the use of agents and business partners is permitted at all by BizJet, it will institute appropriate due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.     Properly documented risk-based due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.     Informing agents and business partners of BizJet's commitment to abiding by laws on the prohibitions against foreign bribery, and of BizJet's ethics and compliance standards and procedures and other measures for preventing and detecting such bribery; and

c.     Seeking a reciprocal commitment from agents and business partners.

12.     Where necessary and appropriate, BizJet will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include:  (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of

the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of anti-corruption laws, and regulations or representations and undertakings related to such matters.

13.     BizJet will develop and implement policies and procedures for mergers and acquisitions requiring that BizJet conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel. If BizJet discovers any corrupt payments or inadequate internal controls as part of its due diligence of newly acquired entities or entities merged with BizJet, it shall report such conduct to the Department as required in Paragraph 10 of this Agreement.

14.     BizJet will ensure that BizJet's policies and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with BizJet and will promptly:

        a.      Train directors, officers, employees, agents, consultants, representatives, distributors, joint venture partners, and relevant employees thereof, who present corruption risk to BizJet, on the anti-corruption laws and BizJet's policies and procedures regarding anti-corruption laws.

        b.      Conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable.

15.     BizJet will conduct periodic review and testing of its anti-corruption compliance code, standards, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and BizJet's anti-corruption code,

C-6

standards and procedures, taking into account relevant developments in the field and evolving international and industry standards.